IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KEVISHA BOUYER, | ) | CASE NO. 1:12-cv-03088 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Kevisha Bouyer ("Plaintiff' or "Bouyer") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 13.   For the reasons set forth herein, the Court

**AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Bouyer was born in 1989.  Tr.  25.  She initially received Supplemental Security Income

("SSI") benefits based on disability as a child as of August 20, 2006, due to depressive disorder,

with an established disability onset date of February 28, 2002.  Tr. 15, 41.

On January 12, 2009, following its review of Bouyer's case to determine whether, as an

adult, Bouyer continued to qualify for SSI benefits, the Social Security Administration ("SSA")

determined that, as of January 2009, Bouyer no longer qualified.  Tr. 30.   On reconsideration, on

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

June 10, 2010, the SSA again determined that Bouyer was no longer eligible for SSI.  Tr. 37-50.

Upon Bouyer's request, an administrative hearing was conducted by Administrative Law Judge

Cheryl Rini ("ALJ") on September 13, 2011.  Tr. 371-446.  In her September 23, 2011, decision

(Tr. 12-26), the ALJ determined that Bouyer's disability ended on January 1, 2009, and that she

had not become disabled again since that date.  Tr. 15, 26.  Bouyer requested review of the ALJ's

decision by the Appeals Council.  Tr. 11.  On October 23, 2012, the Appeals Council denied

Bouyer's request for review, making the ALJ's decision the final decision of the Commissioner.

Tr. 5-8.

## II. Evidence

**A.    Personal, educational and vocational evidence**

Bouyer was born in 1989 and was twenty-one years of age at the time of the

administrative hearing.  Tr. 25, 377.  At the time of the hearing, Bouyer resided with her mom,

her sister and brother, and her niece.  Tr. 381-82.

### 1.    Bouyer's education

According to Bouyer, beginning in about the fourth grade, she attended special education

classes to help her with her learning.  Tr. 377-78.  While in high school, with the exception of

her English class, Bouyer's special education teacher attended classes with her.  Tr. 378-79.

Bouyer also had a separate class with her special education teacher during which her special

education teacher helped her a lot with math and reading.  Tr. 379-80.   She graduated from high

school.  Tr. 377.

After high school, Bouyer attended some classes at Cuyahoga County Community

College (Tri-C) because her mom and high school special education teacher thought she should.

Tr. 42, 403, 408.   While at Tri-C, she did not have an individual special education teacher but

she registered with the Access Program at Tri-C, which provides support services for students with disabilities.  Tr. 284.  For example, through the Access Program, someone was available to assist Bouyer with her math and English.  Tr. 284, 408-09.    On January 11, 2011, Bouyer reported to her medical provider that she had been dismissed from Tri-C for poor academic performance. Tr. 201-02.  She then enrolled at The Ohio Academy Paul Mitchell Partner [Beauty] School ("Paul Mitchell").  Tr. 201-02, 287.  She started at Paul Mitchell on January 19, 2010, and graduated on April 19, 2011.  Tr. 287.  While attending Paul Mitchell she had an IEP which allowed her special accommodations to complete her studies, such as receiving extra time to take her exams and being provided a reader to take her exams.  Tr. 287.  On June 23, 2011, Bouyer took two Ohio State Board of Cosmetology examinations: (1) NIC Cosmetology OH; and (2) NIC Ohio Manager.  Tr. 356-58.  She passed the NIC Cosmetology exam but failed the NIC Ohio Manager exam.  Tr. 357-357A.

  2.    **Bouyer's work history**

  While in high school, Bouyer was employed by KFC in a part-time position.[2]  Tr. 387. Her duties included cleaning tables, floors and packing food for customers' orders.  Tr. 388.  She had problems completing her assigned tasks.  Tr. 388.  For example, she was forgetful and did not clean as often as she was required to.  Tr. 388.  Also, she did not always pack the customers' food orders correctly.  Tr. 389.  Customers would become angry with her and ask for her manager.  Tr. 389.  After a few months, she was fired.  Tr. 389-90.

---

[2] Bouyer's older sister worked in the corporate offices of KFC and assisted Bouyer with getting the job at KFC.  Tr. 387.

She also worked at Tri-C in a part-time position for Marliece L. Harris performing administrative/clerical office work.[3]  Tr. 390.  Bouyer's responsibilities included taking phone messages for Ms. Harris.  Tr. 391.   When taking messages over the telephone, Bouyer had to ask individuals to repeat information a lot and they would get frustrated and hang up or she would end up hanging up on them.  Tr. 391-92.  She was not able to take down voice mail messages accurately and there were a lot of them so she started deleting the messages.  Tr. 393-94.  Bouyer was also responsible for entering student test scores into the computer.  Tr. 394-95.  She was able to input the data but was unable to average the test scores which was also part of the job. Tr. 394-95.  Once Ms. Harris became aware of Bouyer's issues with performing her job duties, she became angry.  Tr. 392, 394.  Bouyer did not handle Ms. Harris's criticism well.  Tr. 392.  For example, Bouyer would cry, walk away and stay in the restroom.  Tr. 392.  Bouyer's employment was terminated as of January, 2010. Tr. 162, 395.   On April 7, 2010, Ms. Harris provided a letter to Bouyer's case manager at Connections wherein she stated that "[w]hile working Kevisha struggle [sic] to remember assignments and had to be reminded several times a day what she needed to complete.  This seemed to frustrate her as she did try to do what was asked of her.  I feel at this time working is not a go [sic] idea for Kevisha."  Tr. 162.

Bouyer attended beautician school and Ms. Battle, owner of Hair Savvy Beauty Salon, gave her a job at the hair salon in December 2010 so Bouyer could gain some experience.[4]  Tr. 288-90, 396, 424.  Her responsibilities included general cleaning and sweeping up hair.[5]  Tr. 289, 398.  She was scheduled to work four days each week from 9:00 a.m. to 4:00 p.m.  Tr. 396-

---

[3] Bouyer's mom was a student at Tri-C and assisted Bouyer with getting the job at Tri-C.  Tr. 390.  Ms. Harris was a GED Examiner for Tri-C.  Tr. 162.

[4] Bouyer indicated that she would like to become a hairdresser but indicated that she is not good at cutting hair.  Tr. 424-28.

[5] If needed, Bouyer could wash hair.  Tr. 398.

97.  However, Bouyer was unable to keep her schedule.  Tr. 299, 397.  She would show up late because it was hard for her to get out of bed.  Tr. 397.  She would wake up in the morning feeling sad and depressed and would not want to get out of bed.  Tr. 397.  Her mom would have to wake her up and she would not get to work some days until 11:00 a.m. or noon.  Tr. 397.  On average she showed up for work only one or two days each week because of her depression.  Tr. 289, 399-400.  She just wanted to be alone in her room rather than face everybody.  Tr. 400.  When she was at the hair salon, rather than perform her work as required, she would sit in a room and watch television.  Tr. 289, 399.  She did not always timely sweep up the hair and customers would trip/slip.  Tr. 289, 399.   Ms. Battle indicated that Bouyer would get frustrated easily and would have breakdowns in front of the customers.  Tr. 289.  Per Ms. Battle, Bouyer made some of her clients feel so uncomfortable that they indicated that they would not come back if Bouyer was still around.  Tr. 289.  Per Ms. Battle, she would not hire Bouyer again for the same job because Ms. Battle did not believe that Bouyer was "fit for working."  Tr. 290.

## B.      Medical evidence and opinions

### 1.      Mental health treatment records (Connections)

Plaintiff received mental health treatment at Connections in 2008 and through at least 2011.[6]  Tr. 101-05, 133-61, 180-267, 282, 347-55.   On January 29, 2008, a new Connections' facility completed an Initial Psychiatric Evaluation.[7]  Tr. 157-60.  Bouyer reported that she felt depressed because she did not like anything about herself.  Tr. 157.  She reported that she disliked her mother, lacked interest and motivation, and did not sleep well at night.  Tr. 157.

---

[6] The administrative record contains Connections treatment notes dated 2008 through 2011.  However, those treatment notes (Tr. 157) and other records (TR. 67) reflect that, even prior to 2008, she was being treated at Connections.

[7] Bouyer reported that she had been receiving treatment at Connections in Beachwood for depression and concentration problems but asked to be transferred to a Connections' facility closer to her home.  Tr. 157.

Bouyer's Mental Status Exam findings were generally normal/average except her mood was noted to be depressed.  Tr. 158-59.  Bouyer denied psychotic symptoms and also denied suicidal and homicidal ideation.  Tr. 159.  Bouyer's diagnoses included major depressive disorder, recurrent and Attention-Deficit/Hyperactivity Disorder (ADHD), with a GAF score of 55.[8]  Tr. 159.  It was noted that Bouyer had issues with medication compliance and social interaction.  Tr. 159.  Bouyer was prescribed medication for her depression/sleep and ADHD.  Tr. 160.

On February 19, 2008, Bouyer reported doing somewhat better.  Tr. 153.  She was less depressed but she was still having problems sleeping.  Tr. 153.  She denied suicidal or homicidal ideation.  Tr. 153.  On May 6, 2008, Bouyer reported that she was not doing well but also indicated that she had not been taking her medication for awhile.  Tr. 151.  She had gotten into an argument with her teacher at school.  Tr. 151.  Bouyer was restarted on her medication.  Tr. 152.  On September 9, 2008, Bouyer presented as calm and cooperative, her insight/judgment and cognition were good, and she had no suicidal or homicidal ideation.  Tr. 149.  Bouyer reported doing good but also indicated that she was not concentrating in class, not completing her assignments, and not sleeping too well at night.  Tr. 149.  Bouyer indicated that she wanted to try Ambien.  Tr. 149.  On December 2, 2008, Bouyer reported that she was not sleeping well even though she was taking Ambien.  Tr. 147.  She also reported that she was not socializing and she was failing in school because she was not motivated to do anything.  Tr. 147.

On February 3, 2009, Bouyer indicated that she was doing poorly.  Tr. 145.  She indicated that the SSA was threatening to stop her SSI benefits because they said there was nothing wrong with her and she was so frustrated that she flushed her medication down the toilet.

---

[8] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

Tr. 145.  She had not been sleeping well and was not doing well in school because she was not concentrating.  Tr. 145.  Her current treatment plan was continued and treatment notes reflect that a letter was written to SSI.[9]  Tr. 146.  Again, on May 12, 2009, Bouyer reported that she was not doing well.  Tr. 143.  She had been feeling depressed and unmotivated.  Tr. 143.  She had been missing a lot of school and was concerned about losing her financial aid.  Tr. 143.  Because she was mad at her mom, she again flushed her medication.  Tr. 143.  On June 22, 2009, Bouyer reported doing well and indicated that she had no new problems.  Tr. 141.  She denied any psychotic symptoms.  Tr. 141.  Because she was doing well, her then current treatment was continued.  Tr. 142.

On January 11, 2010, Bouyer met with a nurse practitioner and reported that she had been out of medication since October 2009 and that she was only sleeping three or four hours, she was frustrated at school and work, and she was dismissed from Tri-C for academic reasons.  Tr. 139. She reported that she was going to start beauty school the following week.  Tr. 139.  Medications were prescribed and a follow up with Dr. Smarty was scheduled.  Tr. 140.   On March 10, 2011, Bouyer again saw a nurse practitioner.  Tr. 137.  Bouyer indicated that she was almost out of her Prozac, Adderall, and Ambien.  Tr. 137.  She indicated that, without Ambien, she sleeps in spurts.  Tr. 137.  She reported occasional outbursts but less so when taking her medication.  Tr. 137.  She indicated that she had low energy and motivation.  Tr. 137.  She was having a difficult time with beauty school; it was not what she thought it would be.  Tr. 137.  Bouyer had no suicidal or homicidal ideation.  Tr. 137.  The nurse practitioner reordered Bouyer's Prozac and Ambien.[10]  Tr. 138.  On April 6, 2010, Bouyer saw Dr. Smarty and reported having frequent headaches and not sleeping well but, if she took two Ambien, she was able to sleep better at

---

[9] It is unclear from the treatment notes when the referenced letter was sent to SSI. Tr. 146.

[10] Bouyer's Adderall was managed by Dr. Smarty.  Tr. 138.

night.  Tr. 135.  Dr. Smarty increased Bouyer's Ambien, continued her Adderall and added Vistaril for anxiety.  Tr. 136.  On May 18, 2010, Bouyer indicated she was not doing well in school and was getting frustrated.  Tr. 195.  However, her anxiety symptoms had improved and she was sleeping better at night.  Tr. 195.  Bouyer's Adderall prescription was increased to better control her ADHD symptoms and her other medications remained unchanged.  Tr. 196.  In August 2010, Bouyer reported that she was not doing well, she was close to being kicked out of school, she ran out of Adderall and had been unable to concentrate.  Tr.189, 191.  Her then current treatment was continued.  Tr. 190, 192.  The following month, on September 21, 2010, Bouyer reported doing a little better but that she had not slept well the prior evening.  Tr. 187. On October 19, 2010, Bouyer reported that she had not slept well for the prior week because she ran out of Ambien.  Tr. 185.  She also indicated that she felt depressed.  Tr. 185.  Her Prozac was increased.  Tr. 186.

On January 7, 2011, Bouyer was still feeling depressed but she was sleeping better and her anxiety level was down.  Tr. 183.  On February 1, 2011, Bouyer was doing good but struggling in school.  Tr. 182.  On March 8, 2011, Bouyer continued to report that she was having a hard time coping with school.  Tr. 350.  Also, she was not sleeping well at night.  Tr. 350.  On July 5, 2011, Bouyer indicated that, for a couple of weeks, she had stopped taking her medications.  Tr. 348.  She was not sleeping.  Tr. 348.  She was lying in bed all day and feeling depressed some days.  Tr. 348.  Dr. Smarty instructed Bouyer to continue her then current medications and to continue with supportive therapy.  Tr. 349.

     2.    **Treating source opinions**

        a.  **Sylvester Smarty, M.D.**

On May 10, 2011, Sylvester Smarty, M.D., completed a Medical Assessment of Ability
to Sustain Work-Related Activities (Mental).[11]  Tr. 274-77.  Dr. Smarty rated Bouyer's ability
(on a percentage basis) to function satisfactorily in various work-related functions during an 8-
hour work day.[12]  Tr. 274-76.  He opined that Bouyer would be able to function satisfactorily
approximately 10% of the time during an 8-hour work day in the following areas: relate to co-
workers; deal with the public; interact with supervisors; deal with ordinary work stress; function
independently; understand, remember, and carry out complex job instructions; relate predictably
in social situations; and demonstrate reliability.  Tr. 274-76.  Dr. Smarty opined that Bouyer
would be able to function satisfactorily approximately 20% of the time during an 8-hour work
day in the following areas: follow work rules; maintain attention and concentration; understand,
remember, and carry out detailed, but not complex, job instructions; and behave in an
emotionally stable manner.  Tr. 274-75.  Dr. Smarty opined that Bouyer would be able to use
judgment satisfactorily approximately 40% of the time during an 8-hour work day.  Tr. 274.   Dr.
Smarty opined that Bouyer would be able to understand, remember, and carry out simple job
instructions satisfactorily approximately 50% of the time during an 8-hour work day.  Tr. 275.
Dr. Smarty opined that Bouyer would be able to maintain personal appearance satisfactorily
approximately 90% of the time during an 8-hour work day.  Tr. 275.

---

[11] Dr. Smarty also wrote a letter wherein he indicated that Bouyer was a patient of his; she had been treated for years
for Major Depressive Disorder and Attention Deficit Hyperactivity Disorder (ADHD); and she was taking Prozac,
Adderall and Ambien.  Tr. 161, 282.  In that same letter, Dr. Smarty stated that Bouyer remained very depressed and
bothered by her inability to pay attention, which he indicated was evidenced by the fact that she does not sleep, is
very irritable and had been failing her college courses.  Tr. 161, 282.  Dr. Smarty opined that Bouyer remained
"disabled from every and all gainful employment by her mental health conditions. Tr. 161, 282.  The letter is
undated but, in her June 17, 2009, Mental RFC, state agency reviewing physician Cindy Matyi, Ph.D., appears to be
referring to the undated letter from Dr. Smarty.  Tr. 131.  Thus, it would appear that the letter was written on or
before June 17, 2009.

[12] Dr. Smarty's percentage ratings were reflected on linear chart rather than as exact percentages.  Tr. 274-76.  Thus,
the ratings noted herein are approximates.

As part of his May 10, 2011, assessment, Dr. Smarty stated that his ratings of Bouyer's functional abilities were supported by the fact that Bouyer suffered from severe Major Depression and Attention Deficit Hyperactivity Disorder.  Tr. 275.  He also indicated that Bouyer was unable to get out of bed to attend school and complete her work.  Tr. 275.  Dr. Smarty stated that Bouyer had poor memory, a low intellectual level, and was unable to engage in rationalization.  Tr. 275.  Also, he indicated that Bouyer had no social life and did not leave her home except to attend doctor appointments.  Tr. 276.  He described Bouyer as irritable and indicated that she avoids contact with others.  Tr. 276.  In a summary comment section, Dr. Smarty stated that "Ms. Bouyer lacks [the] ability to function and cannot hold any job.  She is unable to motivate herself due to depression, she has chronic suicidal thoughts and she is distracted easily by ADHD symptoms."  Tr. 277.  He opined that it was likely that Bouyer would be absent from work more than four times per month.  Tr. 276.   Dr. Smarty also opined that Bouyer had been limited as described in his May 10, 2011, assessment since at least January 12, 2006.  Tr. 276.

### b.  Earnese Hill

Bouyer's case manager, Earnese Hill, completed two Medical Assessments of Ability to Sustain Work-Related Activities (Mental): a May 10, 2011, assessment (Tr. 278-81) and a July 25, 2011, assessment (Tr. 360-63).  Both the May 10, 2011, and July 25, 2011, assessments reflect limitations similar to those contained in Dr. Smarty's May 10, 2011, assessment. Tr. 274-77, 278-81, 360-63.  Ms. Hill's July 25, 2011, assessment reflects greater limitations in certain areas than as reflected in her May 10, 2011, assessment.  Tr. 278-81; 360-63.  For example, on May 10, 2011, Ms. Hill indicated that Bouyer could function independently approximately 20% of an 8-hour work day (Tr. 278) whereas, on July 25, 2011, Ms. Hill indicated that Bouyer could

10

function independently approximately 10% of an 8-hour work day (Tr. 360).  On May 10, 2011, Ms. Hill indicated that Bouyer could relate predictably in social situations approximately 40% of an 8-hour work day (Tr. 279) whereas, on July 25, 2011, Ms. Hill indicated that Bouyer could relate predictably in social situations approximately 20% of an 8-hour work day (Tr. 361).  On May 10, 2011, Ms. Hill indicated that Bouyer could understand, remember and carry out simple job instructions approximately 40% of an 8-hour work day (Tr. 279) whereas, on July 25, 2011, Ms. Hill indicated that Bouyer could understand, remember and carry out simple job instructions approximately 20% of an 8-hour work day (Tr. 361).  In both assessments, Ms. Hill indicated that it was likely that Bouyer would be absent from work more than four times per month and that Bouyer had been limited as described since at least October 2007.  Tr. 280, 362.

### 3. State agency consultative examining physicians

On June 11, 2009, clinical psychologist Richard C. Halas, M.A., met with Bouyer for a consultative examination.  Tr. 106-14.  Dr. Halas conducted a clinical interview, performed a mental status examination, and administered the Wechsler Adult Intelligence Scale IV (WAIS IV).  Tr. 106.  Dr. Halas indicated that Bouyer's "degree of dependency was high" because she had been brought to the "examination and closely accompanied by her mother."  Tr. 106.  Dr. Halas described Bouyer as "cooperative at times, and hesitant and unmotivated at other times."  Tr. 106.  He stated that her ability to relate to him was below average and she was restless and unmotivated.  Tr. 106.  Dr. Halas stated that Bouyer "tended to minimize her problems at times and, at other times, exaggerated the extend [sic] of her problems."  Tr. 106.  Dr. Halas reported that Bouyer had no difficulty sleeping.  Tr. 107.  Bouyer reported that she experiences temper tantrums and crying spells at times.  Tr. 107.  However, Dr. Halas observed neither during the interview.  Tr. 107.  Bouyer denied thoughts of hurting herself or others.  Tr. 107.  Bouyer was

restless, agitated, and inattentive during the interview.  Tr. 107.  She denied feelings of hopelessness, helplessness, and worthlessness.  Tr. 107.

Bouyer did not show any confusion or lack of awareness.  Tr. 107.  She was able to perform simple calculations but unable to perform Serial 7s. Tr. 107.  Her memory for past events was limited and her short-term memory was below average.  Tr. 107.

Bouyer's daily living activities included waking at around 10:00 a.m. and watching movies.  Tr. 108.  She attended church regularly.  Tr. 108.  She reported driving and having a driver's license.  Tr. 108.  She liked doing nail designs for fun.  Tr. 108.  She reported having few friends.  Tr. 108.  Bouyer indicated that she was "uncertain as to what keeps her from working competitively."  Tr. 108.

Bouyer's WAIS IV intelligence test results showed a full Scale IQ of 53 which placed her in the .1 percentile when compared with the general population.  Tr. 108, 110.  Dr. Halas stated that the "close agreement between the client's scores is normally an indication of a valid profile."  Tr. 108.  However, he opined that Bouyer's presentation reflected malingering and that her current presentation was "an underestimate of long-term potentialities."  Tr. 108.  Dr. Halas noted that Bouyer was a  high school graduate who had been in special education classes.  Tr. 108.  He also noted that she had been able to obtain a driver's license.  Tr. 108.

Dr. Halas's diagnostic impressions included: ADHD; Malingering; and Borderline Intellectual Functioning.  Tr. 109.  Psychological stressors include unemployment, financial concerns, dependency on mother, and relationship concerns.  Tr. 109.  Dr. Halas assessed Bouyer with an overall GAF score of 55.  Tr. 109.

With respect to the four work-related mental ability categories, Dr. Halas opined that Bouyer's ability to withstand the stresses and pressures associated with day-to-day work activity

12

was intact and not impaired;[13] her ability to maintain attention and concentration to perform simple, repetitive tasks was mildly impaired; her ability to relate to others, including fellow workers and supervisors was mildly impaired; and her ability to understand, remember, and follow instructions was moderately impaired.  Tr. 109.

### 4.    State agency reviewing psychologists

#### a.   Karla Voyten, Ph.D.

On December 30, 2008, Karla Voyten, Ph.D., completed a Psychiatric Review Technique (Tr. 82-97) and a Mental RFC (Tr. 96-99).  In the Psychiatric Review Technique, Dr. Voyten reflected the fact that Bouyer suffered from ADHD and Major Depressive Disorder, Recurrent, but did not satisfy Listing 12.02 (Organic Mental Disorders) or Listing 12.04 (Affective Disorders).  Tr. 83, 85, 92-93.   When rating the "B" Criteria of the Listings, Dr. Voyten opined that Bouyer had mild restrictions in activities of daily living and moderate restrictions in maintaining social functioning and in maintaining concentration, persistence, or pace.  Tr. 92. There were no episodes of decompensation.[14]  Tr. 92.

In the Mental RFC, Dr. Voyten rated Bouyer's functional capacity in 20 categories.  Tr. 96-97.  Dr. Voyten found no evidence of limitation in 4 categories.  Tr. 96.  Dr. Voyten found that Bouyer was not significantly limited in 11 categories.   Tr. 96-97.  Dr. Voyten found that Bouyer was moderately limited in 5 categories, including ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the

---

[13] Dr. Halas noted that Bouyer had some problems with inattentiveness and restlessness, but did not appear to have an adverse reaction to stress.  Tr. 109.

[14] Dr. Voyten also concluded that the evidence did not establish the presence of the "C" Criteria of the Listings.  Tr. 93.

general public; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to respond appropriately to changes in the work setting.  Tr. 96-97.

Dr. Voyten noted that no treating source opinion had been submitted but, in making her assessment, she reviewed and considered treating source progress notes.  Tr. 98.  She gave great weight to the treating source progress notes.  Tr. 98.  Dr. Voyten concluded that Bouyer's allegations were generally credible but did not preclude her from performing a limited range of work activities. Tr. 98.  Dr. Voyten opined that Bouyer could sustain simple and occasional complex tasks in a setting where tasks are predictable and routine and social interactions are occasional and superficial; Bouyer could not work in situations that require resolving conflicts or supervising others; Bouyer could deal with routine changes but would have difficulty with rapid or unexpected changes.  Tr. 98.

### b.  Cindi Matyi, Ph.D

On June 17, 2009, Cindy Matyi, Ph.D., completed a Psychiatric Review Technique (Tr.115-28) and a Mental RFC (Tr. 129-32).  In the Psychiatric Review Technique, Dr. Matyi reflected the fact that Bouyer suffered from ADHD and Major Depressive Disorder, Recurrent, but did not satisfy Listing 12.02 (Organic Mental Disorders) or Listing 12.04 (Affective Disorders).  Tr. 116, 118, 125-26.  When rating the "B" Criteria of the Listings, Dr. Matyi opined that Bouyer had mild restrictions in activities of daily living and in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace.  Tr.125.  There were no episodes of decompensation.[15]  Tr. 125.

In the Mental RFC, Dr. Matyi rated Bouyer's functional capacity in 20 categories.  Tr. 129-30.  Dr. Matyi found that Bouyer was not significantly limited in 14 categories.   Tr.129-30.

---

[15] Dr. Matyi also concluded that the evidence did not establish the presence of the "C" Criteria of the Listings.  Tr. 126.

Dr. Matyi found that Bouyer was moderately limited in 6 categories, including ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to respond appropriately to changes in the work setting.  Tr. 129-30.

In making her assessment of Bouyer's mental RFC, Dr. Matyi considered a letter from Dr. Smarty wherein he stated that Bouyer was disabled from all gainful employment because of her mental health condition but noted that whether or not a claimant is disabled is an issue reserved to the Commissioner.[16]  Tr. 131.  Dr. Matyi also reviewed treating source treatment notes and the state agency consultative psychological evaluation.  Tr. 131-32.  Dr. Matyi concluded that:

> The claimant is capable of performing routine, one and two-step tasks.  The claimant would perform best in an environment that did not require strict time or production quotas.  The claimant's statements and allegations are not credible, as malingering was noted during the Psych C/E.  Weigh[t] is given to the current Psych C/E and to the mental health center notes from Connections.

Tr. 132.

## C.    Testimonial evidence

### 1.    Bouyer's testimony

Bouyer was represented by counsel at the administrative hearing and testified.[17]  Tr. 374-435.  She testified regarding her educational background, including the fact that she was enrolled

---

[16] Based on Dr. Matyi's summery of the contents of Dr. Smarty's letter, it appears that she had reviewed Dr. Smarty's undated letter.  Tr. 131, 161.

[17] Earnese Hill, case manager from Connections, was also present at the hearing.  Tr. 383.

in special education classes.  Tr. 377-80.  Bouyer was not in special education classes because of behavioral problems but she indicated that she had been suspended once when she was in ninth grade, had received detentions, had once hit a boy in the head, and had some problems acting out on the bus.  Tr. 378, 380-81.  Bouyer indicated that her behavioral problems were the result of her feeling angry and occurred mostly during her ninth-grade year.  Tr. 380-81.  She reported still being angry every now and then.  Tr. 381, 386.  She gets depressed and sad and feels like no one is on her side and she then becomes angry.  Tr. 381.  When she gets angry, she locks herself in her room.  Tr. 381.  She argues with her siblings a lot.  Tr. 381.  She does not have friends. Tr. 384.  While at home, she spends most of her day in her room alone watching television.  Tr. 383-84.   Her mom has to remind her to do her chores, including laundry, cleaning her room and doing dishes.  Tr. 385.  Her mom also has to remind her to take her medication.  Tr. 387.  She has a driver's license and is able to attend her medical appointments on her own.  Tr. 387, 407. Because her mom tells her to go to church, she attends church services two days each week.  Tr. 404-05, 430.  Also, one day each week she attends young adult group functions at her church but does not actively participate.  Tr. 404-06, 429-30.   According to Bouyer, nobody wants to talk with her so she keeps to herself at the church events.  Tr. 430.

Bouyer has problems sleeping.  Tr. 400.  She takes medication to help her sleep and she also takes anxiety medication and was taking that medication during high school.  Tr. 400. During high school, Bouyer missed school a lot and was tardy but was not suspended because of absences.  Tr. 401-02.  Her special education teacher assisted her with making up work that she missed because of her absences.  Tr. 402.

Bouyer reports having attention deficit hyperactivity disorder (ADHD) and that the medication that she takes helps with her inability to sit still and helps a little with her inability to

pay attention or follow through on things.  Tr. 403-04.  Bouyer is treated by Dr. Smarty[18] for her anger and depression.  Tr. 433-35.

### 2.    Vocational expert's testimony

Vocational Expert ("VE") Gene Burkhammer testified at the hearing.  Tr. 435-45.  The ALJ asked the VE to assume a hypothetical individual who is a younger individual with limited education and no past relevant work who: has no exertional limitations and no physical non-exertional limitations; is able to understand, remember, and carry out simple instructions, routine, and repetitive tasks; is able to perform low-stress work, meaning no high production or rapid production quotas; cannot work with the general public; can have superficial contact with coworkers and supervisors; and cannot perform any arbitration, negotiation, confrontation, directing the work of others, or be responsible for the safety of others.  Tr.  435-36.  The ALJ then asked the VE whether there were would be any jobs available that the hypothetical individual could perform.  Tr. 436-37.  The VE indicated that the hypothetical individual would be able to perform the unskilled jobs of laundry laborer (medium, unskilled job with 120,000 positions available nationally, 6,000 in Ohio and 600 locally); hand packager (medium, unskilled job with 150,000 positions available nationally, 7,000 in Ohio and 800 locally); and housekeeping cleaner (light, unskilled job with 500,000 positions available nationally, 30,000 in Ohio, and 2,000 locally).  Tr. 364, 437-38.

In response to questions from Bouyer's counsel, the VE indicated that, even though the hypothetical individual was limited to jobs without high production quotas, every job has its own expectations regarding the timely completion of tasks.  Tr. 440.  Thus, if the individual was unable to complete assigned tasks in a timely manner, the individual would be unable to perform

---

[18] Dr. Smarty's name is misspelled in the hearing transcript.  Tr. 435.  The correct spelling is Dr. Smarty not Schmarty.  Tr. 274.

the stated jobs.  Tr. 440.  The VE also agreed that, in any job, there are work rules that individuals must follow and, if an individual were unable to follow those rules, the individual would be unable to perform those jobs.  Tr. 440-41.  The VE also indicated that, if the individual's ability to pay attention and to concentrate is off task 80 percent of the time, the individual would be unable to perform the stated jobs.  Tr. 445.  The VE also indicated that, if the individual's ability to understand, remember, and carry out simple job instructions was off task 50 percent of the time, the individual would be unable to perform the stated jobs.  Tr. 445.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment,[19] the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

The foregoing standard applies to redetermination claims that occur once a social security claimant reaches 18 years of age. *See* 20 C.F.R. § 416.987(b); s*ee also Lewis v. Comm'r of Soc. Sec.*, 2011 WL 334850, *4 (N.D. Ohio Jan. 31, 2011) (citing *Hamilton v Astrue*, 2010 WL 411322, * 3 (N.D. Ohio Jan. 28, 2010)) ("Once a social security claimant reaches the age of 18, her or his claims are subject to a redetermination under adult standards for disability.").

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 19)97).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her September 23, 2011, decision, the ALJ made the following findings:[20]

1.     Bouyer attained the age of 18 in November 2007.  Tr. 17.  Bouyer was notified that, as of January 1, 2009, she was found no longer disabled

---

[19] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[20] The ALJ's findings are summarized herein.

based on a redetermination of disability under the rules for adults who file new applications.  Tr. 17.

2.  Since January 1, 2009, Bouyer had severe impairments of major depressive disorder, attention deficit disorder (ADD), and borderline intellectual functioning.  Tr. 17.  The ALJ noted that, while there are references to ADHD in the record, there was no evidence of hyperactive behavior.  Tr. 17.

3.  Since January 1, 2009, Bouyer did not have an impairment or combination of impairments that met or medically equaled a Listing, including Listings 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.05 (mental retardation).  Tr. 17-20.

4.  Since January 1, 2009, Bouyer had the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: she is able to understand, remember, and carry out simple instructions; she is able to perform routine and repetitive tasks; she is able to perform low-stress work, specifically work without high production or rapid production quotas; she cannot work with the general public, and can have superficial contact with coworkers and supervisors; she cannot perform a job involving arbitration, negotiation, confrontation, directing the work of others or be responsible for the safety of others.  Tr. 20-25.

5.  Bouyer had no past relevant work.  Tr. 25.

6.  Bouyer was born in 1989, and was a younger individual age 18-49.  Tr. 25.

7.  Bouyer has limited education and can communicate in English.  Tr. 25.

8.  Transferability of job skills was not material to the determination of disability.  Tr. 25.

9.  Since March 31, 2009,[21] considering Bouyer's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Bouyer could perform, including laundry laborer, hand packager, and housekeeping cleaner.  Tr. 25-26.

Based on the foregoing, the ALJ determined that Bouyer's disability ended on January 1, 2009, and she had not become disabled again since that date.  Tr. 26.

---

[21] It is unclear why the ALJ referenced March 31, 2009, rather than January 1, 2009.  However, Bouyer does not claim that the ALJ's reference to March 31, 2009, is an issue.

## V. Parties' Arguments

### A.    Plaintiff's Arguments

Bouyer presents three arguments.  First, Bouyer argues that the ALJ erred in her evaluation of treating source opinions.  Doc. 17, pp. 9-14; Doc. 20, pp. 2-4.  She asserts that the ALJ did not properly weigh treating psychiatrist Dr. Smarty's Medical Assessment of Ability to Sustain Work-Related Activities (Mental).  Doc. 17, pp. 10-12; Doc. 20, pp. 2-4.  She also asserts that the ALJ did not properly weigh Connections' case manager and benefits specialist Earnese Hill's Medical Assessment of Ability to Sustain Work-Related Activities (Mental). Doc. 17, pp. 12-14; Doc. 20, pp. 2-4.  Additionally, Bouyer asserts that the ALJ improperly gave significant weight to the opinions of state agency reviewing physicians Drs. Matyi and Voyten. Doc. 17, pp. 13-14; Doc. 20, pp. 2-4.

Second, Bouyer argues that the ALJ erred by failing to evaluate all relevant evidence of record.  Doc. 17, pp. 14-17; Doc. 20, pp. 4-5.  She asserts that the ALJ did not consider reports from her former employers Marliece L. Harris, GED Examiner at Tri-C, and Debra Battle of Hair Savvy Beauty Salon.  Doc. 17, pp. 15-17; Doc. 20, pp. 4-5.  She also asserts that the ALJ did not reference that, while attending school at Paul Mitchell, Bouyer required special accommodation.  Doc. 17, p. 16; Doc. 20, pp. 4-5.

Third, Bouyer asserts that she does not have the "maximum remaining ability to do sustained work activities in an ordinary work setting on a **regular** and **continuing** basis." Doc. 17, p. 17 (emphasis supplied by Plaintiff); Doc. 20, pp. 5-6.   Thus, she argues that the ALJ erred in establishing her RFC because she did not determine whether Bouyer had the capacity to sustain work on a regular and continuing basis as required by Social Security Ruling 96-8p.

Doc. 17, pp. 17-18; Doc. 20, pp. 5-6.   She also asserts that she has required special accommodations in order to accomplish tasks and the ALJ erred by failing to include such limitations in the RFC.  Doc. 17, pp. 17-18; Doc. 20, pp. 5-6.

**B.     Defendant's Arguments**

In response, Defendant asserts that the ALJ properly evaluated Dr. Smarty's opinion in accordance with the regulations.  Doc. 19, pp. 13-14.  Defendant also asserts that the ALJ properly considered the evidence from caseworker Ms. Hill and that, as a caseworker, Ms. Hill's statements are considered evidence from an "other source" and are not entitled to controlling weight.  Doc. 19, pp. 14-15.   Further, the Defendant argues that the ALJ properly considered and weighed the opinions of state agency reviewing physicians Drs. Matyi and Voyten.  Doc. 19, p. 15.

Second, the Commissioner argues that the ALJ need not reference every piece of evidence in her decision and that a review of the ALJ's decision reflects that the ALJ did consider all of the evidence, including statements from Bouyer's former employers.  Doc. 19, pp. 15-16.

Finally, the Commissioner argues that the ALJ's RFC is supported by substantial evidence.  Doc. 19, pp. 16-18.  Further, the Commissioner argues that there is no support for Bouyer's contention that she is incapable of substantial gainful activity simply because she has required special accommodations.  Doc. 19, p. 17.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.    **The ALJ properly considered and weighed the assessments of Dr. Smarty, case manager Ms. Hill, and the state agency reviewing physicians**

1.    **The ALJ properly considered and weighed Dr. Smarty's assessment**

The ALJ properly considered Dr. Smarty's May 10, 2011, assessment under the "treating physician" rule.  After discussing Dr. Smarty's assessment in detail, the ALJ decided to give his assessment little to no weight.  Tr. 24.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).  Plaintiff takes issue with the ALJ's treatment of Dr. Smarty's assessment because she asserts that the ALJ did not state with specificity how Dr. Smarty's opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques and she asserts that Dr. Smarty's assessment is supported by multiple records from Connections and strengthened by her actual performance in the work environment.  Doc. 17, p. 10.  However, the ALJ's decision makes clear that the ALJ was of the opinion that Dr. Smarty's opinion was not consistent with other substantial evidence in the case record.  For example, the ALJ indicated that the "record does not support" the contention that Bouyer was "essentially non-functioining

across most areas," and proceeded to provide examples of how the record did not support such
an opinion, including the fact that Bouyer graduated from high school, obtained a driver's
license, completed beauty school, and passed a cosmetology examination.[22]  Tr. 24.   As part of
his decision, the ALJ considered evidence from Connections and her past employers which
showed that Bouyer suffered from depression, was inattentive, and unable to follow through.  Tr.
18, 20 (noting evidence that Bouyer had attempted to work but usually forgets her duties or
becomes overwhelmed); 18 (noting that records from Connections show that Bouyer experienced
issues with inattention); Tr. 21, 22 (discussing records from Connections in detail); Tr. 24.
Further, the ALJ found Dr. Smarty had reported symptoms that were not supported by Bouyer's
medical records.  For example, the ALJ correctly noted that, while Dr. Smarty reported that
Bouyer has chronic suicidal thoughts (Tr. 24, 277), her medical records demonstrate otherwise.
(*See e.g.,* Tr. 137 (March 10, 2010, treatment note showing no suicidal or homicidal ideation);
Tr. 153 (February 19, 2008, treatment note indicating that Bouyer denied suicidal or homicidal
ideation); Tr. 149 (September 9, 2008, treatment note showing no suicidal or homicidal
ideation).  Thus, even if Dr. Smarty's assessment is supported by medically acceptable clinical
and laboratory techniques, the ALJ did not err in not providing controlling weight to his
assessment because Dr. Smarty's assessment is not consistent with other substantial evidence in
the case record.  *Wilson.*, 378 F.3d at 544.

Plaintiff argues that the ALJ also erred because she did not provide "good reasons" for
the weight provided to Dr. Smarty's assessment.  Doc. 17, pp. 11-12.   If an ALJ decides to give
a treating source's opinion less than controlling weight, he must give "good reasons" for doing
so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the
treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  Further, in

---

[22] Bouyer did not pass the manager portion of the cosmetology exam.  Tr. 357-357A.

deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis." *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Here, the ALJ did provide good reasons for providing little to no weight to Dr. Smarty's opinion.  The ALJ considered the entire record and determined that Dr. Smarty's assessment was not consistent with Bouyer's own treatment records or the record as whole.  For example, as discussed above, Dr. Smarty's opinion that Bouyer had chronic suicidal thoughts was not supported by Bouyer's medical records.  Further, as noted by the ALJ, Dr. Smarty essentially opined that Bouyer was non-functioning in most areas.  Tr. 24.  The ALJ went on to conclude that Dr. Smarty's severely limiting opinion was not consistent with the fact that Bouyer did graduate from high school, did obtain an driver's license, did complete beauty school, and did pass a cosmetology examination.  Tr. 24.  Plaintiff argues that the ALJ did not consider the fact that Bouyer achieved these things while attending special education classes or with significant accommodations and, therefore, the ALJ's reasons are not good reasons.  Doc. 17, pp. 11-12.  However, Bouyer's argument is unpersuasive.  While not contained in the paragraph specifically discussing Dr. Smarty's assessment, the ALJ's decision makes clear that the ALJ considered the fact that Bouyer was in special education classes (Tr. 19, 22), she had an Individualized

25

Education Plan (IEP) while in high school (Tr. 21), she did better with individual rather than general instruction (Tr. 20, 21), and received special instruction while in college (Tr. 20).

Finally, Bouyer asserts that the ALJ erred in her treatment of Dr. Smarty's assessment because she failed to address each of the required factors under 20 C.F.R. § 404.1527(c).  Doc. 17, p. 12 (relying on SSR No. 96-2p).  More particularly, she asserts that the ALJ failed to consider the length of her treatment relationship with Dr. Smarty and the frequency of the examinations, the nature and extent of the treatment relationship, and Dr. Smarty's specialization.  Doc. 17, p. 12.  However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  See Francis, 414 Fed. Appx. at 804.  Here, the ALJ discussed the treatment records from Connections in detail, including dates of treatment.  Tr. 21-22.  Thus, although the ALJ did not provide a factor-by-factor analysis, the ALJ's decision makes clear that the ALJ was aware of the length and nature of Bouyer's treatment relationship with Dr. Smarty.  Thus, to the extent that the ALJ did not specifically identify or address each of the factors listed 20 C.F.R. § 404.1527(c), remand and reversal is not warranted.

For the reasons discussed herein, the ALJ's explanation of her decision not to provide controlling weight to the severe limitations contained in Dr. Smarty's May 10, 2011, assessment makes sufficiently clear the weight given to the treating physician's opinion and the reasons for that weight, Wilson, 378 F.3d at 544, and those reasons are supported by substantial evidence.  Accordingly, the undersigned finds no error in the ALJ's treatment of Dr. Smarty's May 10, 2011, assessment.

**2.  The ALJ properly considered and weighed case manager Ms. Hill's assessment[23]**

Unlike Dr. Smarty, Ms. Hill is not a physician and the ALJ correctly noted that she is not

an "accepted medical source."[24] Tr. 24.  Thus, the ALJ was not required to provide controlling

weight to Ms. Hill's assessments.[25]  Bouyer argues that, although Ms. Hill is not an acceptable

medical source, the ALJ was still required to consider and apply the same factors that are applied

by an ALJ when considering what weight to provide to an acceptable medical sources opinion.

Doc. 17, pp. 12-13 (relying in part on Social Security Ruling 06-3p).  Even though Ms. Hill is

not an acceptable medical source, the ALJ did in fact consider her opinion as an "other source"

opinion and explained her reasons for the weight provided.  20 C.F.R. § 404.1513; SSR 06-03P,

2006 WL 2329939  (August 9, 2006).  The ALJ stated that she gave little to no weight to Ms.

Hill's assessment because it was not from an acceptable medical source.  Tr. 24.  Further, she

stated that, like Dr. Smarty, Ms. Hill had indicated that Bouyer was "essentially non-functioning

across most areas."  Tr. 24.  As the ALJ indicated in connection with her discussion of Dr.

---

[23] As discussed above in the "Evidence" section, Ms. Hill completed two Medical Assessments of Ability to Sustain Work-Related Activities (Mental).  Tr. 278-81; 360-63.  The ALJ specifically referred to the July 25, 2011, assessment, which is the later of the two assessments.  Ms. Hill's July 25, 2011, assessment contains greater limitations in certain areas than are reflected in her May 10, 2011, assessment.  It is unclear why there are two different forms or why both are not referenced in the ALJ's decision.  However, Bouyer does not claim that the ALJ's reference to the later of Ms. Hill's two assessments is grounds for remand and reversal and thus any such argument is waived. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.")  (internal citations omitted); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006); *see also Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 537 n. 5 (7th Cir. 1992) (applying waiver rule because judges need not devote time to "discussion of argument, raised if at all, 'in a very opaque manner.'").

[24] Acceptable medical sources are-- (1) Licensed physicians (medical or osteopathic doctors); (2) Licensed or certified psychologists; (3) Licensed optometrists; (4) Licensed podiatrists; and (5) Qualified speech-language pathologists.  20 C.F.R. § 404.1513(a).

[25] Ms. Hill also completed a function report on behalf of Bouyer on April 17, 2009.  Tr. 22, 58-65.  Since Ms. Hill was a "non-accepted source" and "someone familiar with Ms. Bouyer's daily functioning," the ALJ gave some weight to that assessment.  Tr. 22.  Bouyer has raised no issues with respect to the ALJ's treatment of the April 17, 2009, function report.  Tr. 58-65.  Thus, any such argument is waived.  *McPherson*, 125 F.3d at 995–96.

Smarty's similar assessment, the record does not support such a contention.  Tr. 24.  As more fully discussed above, notwithstanding evidence of special education and accommodations (which a review of the decision as a whole makes clear were considered by the ALJ), the ALJ found that Ms. Hill's severely limiting assessment was not supported by Bouyer's ability to achieve certain things, including graduating from high school and passing a cosmetology examination.  Tr. 24.  The ALJ's decision with respect to the weight provided to Ms. Hill's assessment is sufficiently clear and is supported by substantial evidence.  Accordingly, the undersigned finds no error in the ALJ's treatment of Ms. Hill's assessment.

### 3.  The ALJ properly considered and weighed the state agency reviewing physicians' assessments

In her decision, the ALJ also considered other medical opinions of record, including state agency reviewing physicians Dr. Voyten and Dr. Matyi and state consultative physician Dr. Halas.  Tr. 22-23.

The ALJ gave significant weight to Dr. Voyten's opinion because the ALJ found Dr. Voyten's opinion generally consistent with the evidence of record.  Tr. 23.  Further, the ALJ stated that, in particular, she gave "weight to the assessment of Ms. Bouyer's functional domains."[26]  Tr. 23.  The ALJ gave great weight to Dr. Matyi's opinion because the ALJ found that it was also consistent with the evidence of record.  Tr. 23.  Further, the ALJ stated that, in particular, she gave "weight to the assessment of Ms. Bouyer's functional domains."[27]  Tr. 23. The ALJ also gave significant weight to consultative examining physician Dr. Halas's opinion. Tr. 22-23.

---

[26] When rating Bouyer's functional abilities, Dr. Voyten opined that Bouyer had mild restrictions in activities of daily living, and moderate restrictions in maintaining social functioning and in maintaining concentration, persistence, or pace.  Tr. 92.

[27] When rating the "B" Criteria of the Listings, Dr. Matyi opined that Bouyer had mild restrictions in activities of daily living and in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  Tr.125.

Bouyer does not argue that the ALJ erred with respect to Dr. Halas.  However, she takes issue with the weight that the ALJ assigned to the opinions of Dr. Voyten and Dr. Matyi.  Doc. 17, pp. 13-14.  Bouyer asserts that the ALJ did not specify what evidence the physicians' opinions were consistent with. Doc. 17, pp. 13-14.  She also asserts that, because the opinions were given two and three years before the hearing (Dr. Voyten - 2008; Dr. Matyi - 2009), they were not reflective of Bouyer's functioning in late 2009, 2010, or 2011.  Doc. 17, p. 14.  Finally, she asserts that the opinions were rendered based on an incomplete medical record because there was no treating physician opinion in the record when the opinions were issued.  Doc. 17, p. 14.  As discussed more fully below, Bouyer's arguments are unpersuasive.

Although the ALJ provided significant and great weight to the reviewing physicians' opinions, she did not provide controlling weight to those opinions.  Further, although the opinions were rendered prior to the issuance of Dr. Smarty's May 10, 2011, assessment, both Dr. Voyten and Dr. Matyi reviewed treating source notes and Dr. Matyi reviewed Dr. Smarty's undated opinion letter.  Tr. 98, 131.  More particularly, Dr. Voyten noted that no treating source opinion had been submitted but indicated that greatest weight had been given to treating source progress notes.  Tr. 98.  Dr. Voyten then indicated that she found Bouyer's allegations generally credible but indicated that Bouyer would not be precluded from performing a limited range of work activities.  Tr. 98.  With respect to Dr. Matyi's review, she not only considered treating source treatment notes, she also considered  Dr. Smarty's undated letter wherein he offered his opinion that Bouyer was "disabled from every and all gainful employment by her mental health condition."[28]  Tr. 131.   Thus, Bouyer's assertion that the opinions were offered without consideration of any records or opinions from Dr. Smarty is not supported by the record.

---

[28] Dr. Matyi also reviewed and considered the opinion of consulting examining physician Dr. Halas who evaluated Bouyer.  Tr. 131-32.

Further, although the opinions were issued in 2008 and 2009, they do relate to the period of time after Bouyer turned 18 years of age and thus are relevant.  Further, Bouyer has not argued nor demonstrated that her condition became significantly worse after the issuance of Dr. Matyi's opinion on June 17, 2009.  Thus, even though the opinions were issued prior to the administrative hearing, they are relevant to a determination of disability.  Moreover, even though the state agency reviewing physicians' opinions were issued earlier, the ALJ considered all the medical records, including those from late 2009, 2010, and 2011 (Tr. 21-22) and found the state agency reviewing physician opinions to be "generally consistent with the evidence of record." (Tr. 23).

Although the ALJ gave more weight to the opinions of Dr. Voyten and Dr. Matyi than Dr. Smarty's May 10, 2011, assessment, the ALJ sufficiently explained her decision and that decision is supported by substantial evidence. Accordingly, the ALJ did not err in her consideration of and treatment of the medical opinion evidence. Additionally, the ALJ gave significant weight to the opinion of consulting examining physician Dr. Halas.  Tr. 21-22.  Thus, the ALJ's decision is also supported by Dr. Halas's consultative findings.

**B.     The ALJ properly considered the evidence, including evidence regarding her prior employment and enrollment at Paul Mitchell**

Bouyer argues that the ALJ erred because she failed to consider evidence relating to Bouyer's past employment and enrollment at Paul Mitchell.   Doc. 17, pp. 15-17.  More particularly, Bouyer asserts that the ALJ erred because: (1) she failed to consider the April 7, 2010, letter from GED examiner Ms. Harris (Tr. 162) and failed to assign weight to the letter; (2) she failed to reference the fact that, while attending Paul Mitchell, Bouyer was given special accommodations to complete her studies, including extra time and a reader to help her take her

exams (Tr. 287); and (3) she failed to consider Hair Savvy Beauty Salon owner Ms. Battle's questionnaire (Tr. 288-89).   Doc. 17, pp. 15-17.

The Social Security Regulations provide that all evidence in the case record will be considered when Social Security makes a disability decision.  20 C.F.R. § 404.1520 (a)(3). Further, pursuant to SSR 06–03p, an ALJ must "consider all relevant evidence in an individual's case record," which includes opinion evidence from "other sources."  2006 SSR LEXIS 5, *15 (Aug. 9, 2006).  An ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent review to follow the adjudicator's reasoning."  *Id.* However, SSR 06-03p does not include "an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'"  *Chambers v. Astrue*, 835 F.Supp.2d 668, 678 (S.D. Ind. 2011). Moreover, it is not necessary for an ALJ decision to include a "discussion of every single piece of evidence."  *Allison v. Comm'r of Soc. Sec.*, 108 F.3d 1376, * 3 (6th Cir. 1997).

Here, although the ALJ did not specifically identify the letter from Ms. Harris or the questionnaire from Ms. Battle, the ALJ considered the evidence in the record that reflected the information contained in the correspondence from Ms. Harris and Ms. Battle.  For example, the ALJ stated that Bouyer "testified that she has attempted to work, but she usually forgets her duties or becomes overwhelmed."  Doc. 18.  The ALJ also stated that "Bouyer testified that she has difficulty following instructions, and becomes easily frustrated.  She has attempted to work, but usually forgets her duties or becomes overwhelmed. She has walked off jobs in the past."  Tr. 20.  The ALJ also considered Ms. Hill's function report wherein she indicated that Bouyer had been fired from jobs in the past because of an inability to get along with people.  Tr. 22

(referencing Exhibit 11 (Tr. 58-65)).  Ms. Hill also indicated, and the ALJ considered, that

Bouyer had problems with work because of poor attendance, poor concentration and poor task

completion.  Tr. 22, 64.  Additionally, to the extent that Ms. Harris or Ms. Battle offered their

personal opinions that Bouyer was disabled and therefore unable to work, whether or not an

individual is disabled or unable to work is an issue reserved to the Commissioner and such

opinions from other sources are not entitled to controlling weight.  *See* 20 C.F.R. § 404.1527(d).

Also, although the ALJ did not specifically mention the letter from Paul Mitchell which

stated that Bouyer was allowed special accommodations (Tr. 287-88), it is clear that the ALJ

considered the fact that, while enrolled in school, Bouyer did have individual instructions and

accommodations provided (Tr. 22 (noting that Bouyer was in special education classes); Tr. 21

(noting that Bouyer had IEP while in high school and IEP accommodations when taking the

Ohio Graduation Test); Tr. 20, 21 (noting that Bouyer did better with individual rather than

general instruction); Tr. 20 (noting that Bouyer  received special instruction while in college)).

"Although required to develop the record fully and fairly, an ALJ is not required to

discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not

indicate that it was not considered." *Dykes ex rel. Brymer v. Barnhart*, 112 Fed. Appx. 463, 467

(6th Cir. 2004) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  As shown, in this

case, the ALJ carefully considered all the evidence in reaching her determination, including other

evidence regarding Bouyer's work attempts and need for special accommodations.  Tr. 17-25.

*See, e.g., Brewer v. Astrue,* 2012 WL 262632 (N.D. Ohio Jan. 30, 2012) (citing *Books v. Chater*,

91 F.3d 972, 980 (7th Cir. 1996) for its finding of "no error where the testimony of a claimant's

sibling did not constitute a separate line of evidence but rather, it served strictly to reiterate, and

thereby corroborate, the claimant's own testimony concerning his activities and limitations.")
(internal quotations omitted).

Based on the foregoing, the ALJ's failure to specifically identify or address
correspondence from Ms. Harris, Ms. Battle and/or Paul Mitchell does not warrant reversal and
remand.

**C.      The RFC is an issue reserved to the Commissioner and the ALJ's RFC is supported
        by substantial evidence**

The regulations make clear that a claimant's RFC is an issue reserved to the
Commissioner and the ALJ is to assess a claimant's RFC "based on all of the relevant medical
and other evidence" of record. 20 C.F.R. §§ 404.1545(a); 404.1546(c); *see also Coldiron v.
Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act
instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC"); *Poe v.
Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("an ALJ does not improperly
assume the role of a medical expert by assessing the medical and non-medical evidence before
rendering a residual functional capacity finding").

With respect to her RFC determination, the ALJ concluded that the:

> Residual functional capacity assessment is supported by the objective evidence
> and the opinion evidence, with appropriate weight assigned. Specifically, I find
> the objective evidence, the State agency opinions, and the opinion of the
> consultative examiner establish that Ms. Bouyer has no greater functional
> limitations than identified in the aforementioned residual functional capacity. I
> considered the opinion of Dr. Smarty, but ultimately the evidence of record and
> testimonial evidence do not establish limitations as severe as indicated.

Tr. 24-25.

Bouyer asserts that the ALJ erred in establishing her RFC because the ALJ did not
determine whether Bouyer had the capacity to sustain work on a regular and continuing basis as
required by SSR 96-8p. Doc. 17, pp. 17-18. Bouyer's third argument is a variation and/or

combination of her first two arguments, which are without merit.  For example, Bouyer claims that the RFC is faulty because it does not account for the severe limitations contained in Dr. Smarty's and Ms. Hill's assessments.  Doc. 17, pp. 17-18.  However, the Court has already determined that the ALJ properly considered and weighed both Dr. Smarty's and Ms. Hill's assessments.  Thus, the ALJ did not err in not including in the RFC limitations contained in those assessments.

Further, to the extent that Bouyer relies upon statements from her past employers and the letter from Paul Mitchell regarding the special accommodations provided to her, the Court has addressed those arguments and found that the ALJ considered that evidence when reaching her decision. Moreover, while Bouyer suggests that, because she required special accommodations in school, the ALJ was required to conclude that she was unable to perform sustained work and therefore is disabled, Bouyer does not provide authority for such a bright line rule.

Here, the ALJ accounted for limitations that are supported by the evidence.  In reliance on VE testimony in response to a hypothetical question that contained limitations that the ALJ found credible, the ALJ concluded that, based on that RFC, there was work that Bouyer could perform. *See Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) ("[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence . . . [the] [h]ypothetical questions . . .  need only incorporate those limitations which the ALJ has accepted as credible") (internal citations and quotations omitted).  Bouyer has failed to demonstrate that the ALJ's RFC and ultimate disability determination are not supported by substantial evidence.  Thus, her request for reversal and remand based on the ALJ's RFC determination is without merit.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated:  December 13, 2013

_____
Kathleen B. Burke
United States Magistrate Judge